ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
        – and –
DANIELLE S. MYERS (259916)
JENNIFER N. CARINGAL (286197)
MICHAEL ALBERT (301120)
JUAN CARLOS SANCHEZ (301834)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com
malbert@rgrdlaw.com
jsanchez@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY TOOLE, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>AFFIRM HOLDINGS, INC., et al.,<br><br>                              Defendants. | Case No. 3:22-cv-01243-VC<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ..................................................................................1

II.     JURISDICTION AND VENUE ............................................................................3

III.    THE PARTIES.......................................................................................................3

IV.     SUBSTANTIVE ALLEGATIONS ......................................................................4

        A.      Background ................................................................................................4

        B.      False or Misleading Statements and Omissions with Scienter ................7

        C.      Loss Causation ..........................................................................................9

V.      CLASS ACTION ALLEGATIONS ...................................................................10

VI.     CAUSES OF ACTION ......................................................................................12

        COUNT I ............................................................................................................12

        COUNT II ...........................................................................................................12

VII.    PRAYER FOR RELIEF ....................................................................................13

VIII.   JURY DEMAND................................................................................................14

Lead Plaintiff Eric Nunez ("Lead Plaintiff") and Plaintiff Bogdan Peres (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants,[1] allege the following based upon Plaintiffs' personal knowledge and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, but was not limited to, a review of: (i) Defendants' public documents, conference calls, and announcements; (ii) United States Securities and Exchange Commission ("SEC") filings; (iii) wire and press releases published by and regarding Affirm Holdings, Inc. ("Affirm" or the "Company"); (iv) analyst reports and advisories about the Company; and (v) information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, excluding Defendants, who purchased or otherwise acquired Affirm securities on or after approximately 1:15 p.m. Eastern on February 10, 2022, and who were damaged as of the market close that day and/or the following day (the "Class Period") by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Affirm operates a credit card alternative which allows consumers to pay for purchases over time. The Company is a leading provider of "buy-now, pay-later" ("BNPL") services, the use of which grew immensely during the COVID-19 pandemic as consumers increasingly shopped online. The U.S. Consumer Financial Protection Bureau ("CFPB") has explained that "'[b]uy now, pay later is the new version of the old layaway plan, but with modern, faster twists where the consumer gets the product immediately but gets the debt immediately too,'" causing the consumers to accumulate more debt more quickly. *Consumer Fin. Bureau Opens*

---

[1]      Defendants are Affirm Holdings, Inc., Affirm Chief Executive Officer Max Levchin, and Affirm Chief Financial Officer Michael Linford.

*Inquiry Into "Buy Now, Pay Later" Credit*, CFPB (Dec. 16, 2021), https://www.consumer
finance.gov/about-us/newsroom/consumer-financial-protection-bureau-opens-inquiry-into-buy-
now-pay-later-credit/. The Company operates by providing loans to enable individuals, including
those the Company considers "subprime," or less able financially to support the higher debt loads
the Company enables them to amass, to make consumer purchases.

3.      Affirm maintains an official Twitter account through which a company
spokesperson publishes statements – or "tweets" – including periodic financial results. On
February 10, 2022, Affirm was scheduled to release its 2Q22[2] (October to December of calendar
year 2021) financial results. An Affirm spokesperson sought to take advantage of the anticipation
surrounding Affirm's earnings announcement by posting a tweet at 10:15 a.m. Pacific/1:15 p.m.
Eastern (the "Tweet"), inviting the public to "[t]une in today at 2pm." In addition, the Tweet
proclaimed that "[a]nother great quarter is in the books" and emphasized Affirm's growth in the
prior quarter. The Tweet caused the Company's stock to jump by 11% during intraday trading.

4.      But, the Tweet was false and misleading in that the Company knowingly, or with
deliberate recklessness, omitted material information. For example, the Tweet failed to disclose
that losses per share during the preceding quarter of $0.57 were far greater than the market
consensus of $0.37. Additionally, despite the Tweet touting Affirm's growth, Defendants knew
that growth was slowing, not accelerating. This knowledge was reflected in the below-consensus
guidance range that the Company published later that day of $325 million to $335 million, when
the market expected approximately $335 million.

5.      Not only did the Company make a false or misleading statement at 10:15 a.m.
Pacific/1:15 p.m. Eastern with the Tweet, Affirm also demonstrated its awareness of the
misstatement at approximately 10:31 a.m. Pacific/1:31 p.m. Eastern by deleting the Tweet.
However, Affirm deleted the Tweet *sub silentio* and therefore violated its duty to correct the
misleading statements and omissions in the Tweet that it deleted. After the deletion, but before

---

[2]      Specific quarters in the Company's fiscal year are designated by the quarter number
followed by the letter Q. Thus, 2Q22 indicates Affirm's second quarter in fiscal year 2022.

Affirm published its 2Q22 earnings press release at 11:48 a.m. Pacific/2:48 p.m. Eastern, investors continued to rely on the misleading Tweet as relevant information.

6.       On news of the omitted earnings and revenue information at 2:48 p.m. Eastern on February 10, 2022, Affirm's share price fell $24.89 per share from an intraday high of $83.57 per share to close at $58.68 per share on February 10, 2022, approximately a 32% drop.

7.       As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Lead Plaintiff Nunez lost over $400,000 standing alone.  This action seeks to recover those damages and those suffered by other members of the Class.

## II.       JURISDICTION AND VENUE

8.       The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §§78aa).

10.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).   Affirm is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities alleged in this Complaint took place within this Judicial District.

11.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.      THE PARTIES

12.      Lead Plaintiff Eric Nunez ("Nunez"), as set forth in his previously-filed certification, acquired Affirm securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  *See* ECF 31-2.

13.     Plaintiff Bogdan Peres ("Peres"), as set forth in his certification filed herewith as Exhibit A, acquired Affirm securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Plaintiffs Nunez and Peres are sometimes referred to herein collectively as "Plaintiffs."

15.     Affirm is a Delaware corporation with its principal executive offices located at 650 California Street, San Francisco, California 94108.  The Company's Class A common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the trading symbol "AFRM."

16.     Defendant Max Levchin ("Levchin") is, and was at all relevant times, Affirm's Chief Executive Officer ("CEO") and the Chairman of the Company's Board of Directors.

17.     Defendant Michael Linford ("Linford") is, and was at all relevant times, Affirm's Chief Financial Officer ("CFO").

18.     Defendants Levchin and Linford are sometimes referred to herein collectively as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

19.     Affirm operates a digital platform that provides loans to consumers to buy consumer products.  Most prominently, the Company offers a BNPL payment service that allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments.  Affirm touts its proprietary algorithmic technology, based on Affirm's proprietary data, that assesses consumers' ability to repay consumer debt.  Affirm claims its credit underwriting prowess is key to the Company's ability to attract and retain both consumers and business partners.  The Company markets its consumer credit products to a variety of merchants and consumers.  Affirm categorizes potential consumer borrowers as "prime," "near-prime," and "subprime."

20.     Business partners are important to Affirm because they drive consumers to Affirm's platform.  For example, on August 27, 2021, Affirm announced a new partnership with

Amazon.com, Inc. ("Amazon") through a press release and shortly thereafter filed a report with the SEC focused on that announcement.  On November 10, 2021, in its 1Q22 financial results press release, the Company highlighted that it "ha[d] expanded its relationship with Amazon" and that "Affirm will be generally available to support all eligible purchases of $50 or more on Amazon.com and the Amazon shopping app in the United States."  At the same time, the Company selectively disclosed financial details about the partnership and favorable credit performance statistics, as well additional financial metrics relating to those statistics.

21.     Continuing to hype the Amazon partnership, at public investor conferences on November 16, 2021, Linford stated, among other things, that "we thought it was important that the market understood what was going on" with the Amazon partnership.  The next day, he told the market a number of things about the Company's Amazon deal, including that the terms of the deal were "going to give us a carve-out space to really get a big lead on the world's largest e-comm[erce] platform, at least through January 2023."  Linford said the Company was "quite proud of the [Amazon] win" and likened the deal to another that drove "explosive consumer growth."

22.     In its November 2021 public statements and thereafter, the Company omitted key Amazon deal terms and how the partnership with Amazon would impact Affirm's financials.  In November 2021, for example, Affirm excluded the Amazon deal from the "GMV, revenue, [and] transaction cost[]" that it touted to the market even though Affirm did include technology and marketing expenses related to the Amazon deal.  Affirm should have and could have included additional information about the Amazon partnership in its outlook, and its statements about the deal itself.[3]

---

[3]     When Affirm did include Amazon in its financial outlook for fiscal year 2022, upon the release of its 2Q22 Form 10-Q on February 14, 2022, investors were finally able to see, for example, that the Amazon partnership did not positively contribute to Affirm's bottom line in 2022.  When comparing the financial outlooks for fiscal year 2022 before and after the Amazon partnership, as seen in the 2Q22 and the 3Q22 releases, respectively, the financials accompanying the Amazon deal were much less positive.  While Affirm's GMV increased by 10% to $14.6 to $14.8 billion, its revenue less transaction cost saw virtually no growth – less than 2% – at $585 to $595 million, meaning that while Amazon would bring more customers to Affirm, these customers would not contribute any additional net revenue based on Affirm's own financial outlook for 2022.  "GMV" means gross merchandise volume and is defined by Affirm "as the total dollar amount of

23.     Over the same period, the Company failed to disclose facts sufficient for reasonable investors to assess the creditworthiness and performance of the loans that the Company provided to its customers.  These and other circumstances caused the CFPB to order the Company to produce "information about BNPL practices relating to servicing, credit reporting, returns and refunds, delinquencies, defaults, debt collection, and charge-offs," as a CFPB sample order shows.[4]  Even after receiving regulatory scrutiny on these subjects, the Company continued to withhold important information about its credit metrics, including Affirm's "all-important delinquency trends," as securities analysts put it.  For example, the Company purposely omitted information from its public statements that it had published in prior, substantially similar, disclosures regarding its consumer delinquency statistics, as the following chart illustrates:

Delinquency Performance Chart Based on Data Available to Affirm on Feb. 10, 2022



---

all transactions on the Affirm platform during the applicable period, net of refunds."  This insubstantial net revenue contribution of the Amazon partnership also is in stark contrast to a considerable grant of stock warrants used by Affirm as incentive to Amazon.  The deal provided up to 22 million in warrants to Amazon, of which 1 million were immediately vested at a value of $133.5 million.

[4]     *See* https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-opens-inquiry-into-buy-now-pay-later-credit/; *see also* Rohit Chopra, *Order to File Information,* CFPB (Dec. 16, 2021), https://files.consumerfinance.gov/f/documents/cfpb_bnpl_sample-order_2021-12.pdf.

24.     Except for the red-dotted line pertaining to Affirm's consumer delinquencies[5] for January 2022, Affirm published the above chart in a February 10, 2022 earnings supplement, leading reasonable investors to believe that delinquencies were trending downward – a good trend. In fact, delinquencies were trending upward – a bad trend – as data readily available to Defendants showed.  The above chart adds the red-dotted line based upon data later published (on May 12, 2022) focusing on data through the end of January 2022.  But that later-published data was readily available and known to Defendants, or recklessly disregarded by them, on or before February 10, 2022.

25.     Nonetheless, negative credit-related and Amazon-related facts surfaced over time, including on February 10, 2022.

**B.     False or Misleading Statements and Omissions with Scienter**

26.     On February 10, 2022, an Affirm spokesperson issued a communication from Affirm's Twitter account that stated: "Another great quarter in the books [] as we accelerated our growth.  Leveraging our superior technology & putting people first = increasing total # of transactions by 218%, active consumers by 150%, GMV by 115%, & revenue by 77%!  Tune in today at 2pm PT."  Affirm (@Affirm), Twitter (Feb. 10, 2022 1:15 p.m.).  Affirm published this tweet at 10:15 a.m. Pacific/1:15 p.m. Eastern (the "Tweet") – during market hours as the Company's stock traded on the NASDAQ.

27.      The Tweet was important and material.  It caused the Company's stock to jump by 11% during intraday trading.  And market participants immediately started discussing the positive information conveyed by the Tweet.  One source that has over 132,000 followers, for example, stated during trading hours that the news was good and that he was "so bullish" on the stock.  Wall Street Memes (@wallstmemes), Twitter (Feb. 10, 2022), https://twitter.com/wallstmemes /status/1491850521908498440.  Stock analysts also issued positive commentary about the Tweet: (i) Barclays equity research published a note that Affirm's "Twitter feed announced a handful of

---

[5]     The chart shows Affirm's consumer delinquencies of 30 days or more, sometimes called "30+" delinquencies by market participants.

data points" from the second fiscal quarter "pointing to a material" beat of revenue and another metric in the quarter, and "[w]hile we are waiting for a full set of results after the [market] close[s] today" – Barclays continued – "this early release points to very strong continued momentum in the business" including revenue growth figures exceeding expectations by 14 percentage points (77% vs. Street at 63%); and (ii) Stephens equity analysts published observations similar to those published by Barclays, also noting that the Company's stock price increase "ma[de] sense" on account of the favorable Tweet.[6]

28.     The Tweet was materially false and/or misleading because it included cherry-picked metrics that made it appear that the Company had performed better than it actually did. The Tweet triggered a duty to correct, specifically, no later than 10:31 a.m. Pacific/1:31 p.m. Eastern.  The Company could have, and should have, alerted market participants that its 10:15 a.m. Pacific/1:15 p.m. Eastern communication was materially false or misleading because the Company removed the Tweet at approximately 10:31 a.m. Pacific/1:31 p.m. Eastern and knew of its misleading nature.  Importantly, the Company did not inform investors at that time that the Tweet it removed was an inappropriately favorable presentation of its quarterly results.

29.     The Company omitted material facts both from the Tweet and at 10:31 a.m. Pacific/1:31 p.m. Eastern, when it removed the Tweet – the latest possible time when the Company's duty to correct and tell investors that the Tweet was false or misleading could have arisen.  Among the key facts omitted by the Tweet and during the correction event (*i.e.*, removal of the Tweet) of approximately 10:31 am Pacific/1:31 pm Eastern were:

(a)     The Company was deliberately reckless in failing to disclose the truth in the Tweet and at 10:31 a.m. Pacific/1:31 p.m. Eastern when it owed investors a duty to correct the Tweet.  For example, the Company's losses per share were 57 cents as compared to 37 cents consensus expectations for a "miss" of over 50 percent (or 20 percentage points) on, among other

---

[6]     The market participants discussed above and others published their positive commentaries about the Tweet after Affirm removed the Tweet from its Twitter feed.  This shows reasonable investors continued to believe the Company was going to post favorable results because, at the time it removed the Tweet, the Company gave no reasons why it was doing so.

things, higher expenses.[7]  This massive earnings miss also was accompanied by a material slow-down in revenue growth: the Company gave a third quarter "revenue outlook [of] $325 million to $335 million," while the "consensus estimate was for $334.8 million," which market participants interpreted to be a "revenue guidance miss.";[8] and

        (b)        The Company was deliberately reckless in failing to disclose the negative earnings and revenue information when it issued the Tweet, and at the time the Company effectively admitted it could have, and should have, corrected that Tweet at approximately 10:31 a.m. Pacific/1:31 p.m. Eastern – the time it removed the Tweet with no explanation.  The Company was deliberately reckless when it posted the Tweet because Defendants had access to all the 2Q22 earnings data at 10:15 a.m. Pacific/1:15 p.m. Eastern and only published the misleading growth information.  This is evidenced by, for example, the 11:48 a.m. Pacific/2:48 p.m. Eastern press release and subsequent earnings call statement admitting the "growth" information in the Tweet was a "small portion" of the earnings results.  Accordingly, the Company was deliberately reckless, at least, when it posted the Tweet.  Moreover, the Company's failure to correct the Tweet was nothing less than intentional conduct when the Tweet was deleted due to its misleading nature without attendant explanation that it was misleading or publication of the complete results.  Additionally, the omitted earnings results, losses per share, and revenue guidance showing slowing growth are "core operations" that Defendants Levchin and Linton, the CEO and CFO of the Company respectively, would have known, particularly in light of their preparation for the Company earnings call scheduled for 2:00 p.m. Pacific/5:00 p.m. Eastern that afternoon.

**C.**      **Loss Causation**

        30.      At 11:48 a.m. Pacific/2:48 p.m. Eastern, Affirm caused the financial press to publish the Company's Q2 Earnings Press Release (the "Q2 Press Release").  The Q2 Press

---

[7]      Ines Ferré, *Affirm Stock Closes 21% Lower After Revenue Guidance Miss*, Yahoo! (Feb. 10, 2022), https://news.yahoo.com/affirm-stock-tanks-after-inadvertent-earnings-results-tweet-weak-revenue-guidance-212329813.html.

[8]      Ferré, https://news.yahoo.com/affirm-stock-tanks-after-inadvertent-earnings-results-tweet-weak-revenue-guidance-212329813.html.

Release included the earnings and revenue "misses" identified above.  On news of these "misses," Affirm's share price plummeted $24.89 per share from an intraday high of $83.57 per share to close at $58.68 per share on February 10, 2022, or approximately 32%.   As a result of the Company's recklessly false or misleading statements and/or omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Standing alone, Lead Plaintiff Nunez – an individual investor – lost approximately $406,000 as a result of the Company's reckless and materially false or misleading statements and/or omissions.

## V.      CLASS ACTION ALLEGATIONS

31.      Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class.  The Class is defined as:

> All persons and entities who purchased or otherwise acquired the Company's common stock after 1:15 p.m. Eastern on February 10, 2022, and who were damaged as of the market close that day and/or the following day (the "Class Period").

> Excluded from the Class are Defendants herein, members of the immediate families of the Individual Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

32.      Because the Company has tens of millions of shares of common stock outstanding, and because the Company's shares were actively traded on the Nasdaq Global Select Market ("NASDAQ"), members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe Class members number at least in the thousands and are geographically dispersed.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

33.      Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same

false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

34.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (i) whether the federal securities laws were violated by Defendants' acts as alleged herein; (ii) whether statements made by the Company during the Class Period misrepresented and/or omitted material facts about Affirm and its business; (iii) whether the price of the Company's common stock was artificially inflated during the Class Period; (iv) the extent of injuries sustained by members of the Class; and (v) the appropriate measure of damages.

36.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) it traded on the Nasdaq; (ii) the Company filed periodic public reports with the SEC; and (iii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services.  Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements and omissions by the Company.  Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*,

406 U.S. 128 (1972), as the Company omitted material information in their Class Period statements in violation of a duty to disclose such information.

## VI.    CAUSES OF ACTION

### COUNT I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against the Company)

37.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  During the Class Period, the Company disseminated or approved the false statements specified above, which it knew or deliberately disregarded were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The Company violated §10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) in that it: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's common stock during the Class Period.  Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Company's false and/or misleading statements and/or omissions.

### COUNT II

### Violation of §20(a) of the Exchange Act
### (Against all Defendants)

38.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  During the Class Period, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs.   Because of their senior positions, the Individual Defendants knew the adverse nonpublic information about the Company's business practices. Because of their positions of control and authority as senior executives of the Company, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public statements and filings that the Company disseminated in the marketplace before and during the Class Period concerning the Company's results and operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.   The Company, in turn, controlled the Individual Defendants and all of the Company's employees.   Defendants therefore were "controlling persons" within the meaning of §20(a) of the Exchange Act (15 U.S.C. §78t(a)).   In this capacity, they participated in the alleged unlawful conduct that artificially inflated the market price of the Company's stock.   By reason of the foregoing, Defendants violated §20(a) of the Exchange Act (15 U.S.C. §78t(a)).

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Determining that this action is a proper class action and designating Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## VIII.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  July 5, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS

                    s/ Jason C. Davis
              JASON C. DAVIS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIELLE S. MYERS
JENNIFER N. CARINGAL
MICHAEL ALBERT
JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com
malbert@rgrdlaw.com
jsanchez@rgrdlaw.com

Lead Counsel for Lead Plaintiff

EXHIBIT A

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Bogdan Peres ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _20th_ day of June, 2022.

> DocuSign by:
> *Bogdan Peres*
> D0198C5531B743B

_____
                    Bogdan Peres

AFFIRM

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/10/2022 | 1 | $77.50 |
| 02/10/2022 | 902 | $77.50 |
| 02/10/2022 | 200 | $79.41 |
| 02/10/2022 | 50 | $79.40 |
| 02/10/2022 | 75 | $79.41 |
| 02/10/2022 | 100 | $79.36 |
| 02/10/2022 | 50 | $79.40 |
| 02/10/2022 | 100 | $79.38 |
| 02/10/2022 | 100 | $79.41 |
| 02/10/2022 | 100 | $79.38 |
| 02/10/2022 | 10 | $79.41 |
| 02/10/2022 | 100 | $79.36 |
| 02/10/2022 | 100 | $79.38 |
| 02/10/2022 | 100 | $79.38 |
| 02/10/2022 | 10 | $79.40 |
| 02/10/2022 | 100 | $79.40 |
| 02/10/2022 | 75 | $79.40 |
| 02/10/2022 | 374 | $79.40 |
| 02/10/2022 | 100 | $79.40 |
| 02/10/2022 | 100 | $79.39 |
| 02/10/2022 | 40 | $79.41 |
| 02/10/2022 | 300 | $79.38 |
| 02/10/2022 | 100 | $79.39 |
| 02/10/2022 | 25 | $79.42 |
| 02/10/2022 | 2,000 | $79.35 |
| 02/10/2022 | 100 | $79.40 |
| 02/10/2022 | 3,290 | $60.78 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 02/10/2022 | 1,200 | $79.95 |
| 02/10/2022 | 900 | $79.95 |
| 02/10/2022 | 20 | $79.95 |
| 02/10/2022 | 300 | $79.95 |
| 02/10/2022 | 100 | $79.95 |
| 02/10/2022 | 94 | $79.95 |
| 02/10/2022 | 261 | $79.95 |
| 02/10/2022 | 199 | $79.95 |
| 02/10/2022 | 200 | $79.95 |
| 02/10/2022 | 1,250 | $79.95 |
| 02/10/2022 | 100 | $58.33 |
| 02/10/2022 | 1,000 | $58.23 |
| 02/10/2022 | 3,309 | $58.41 |
| 02/10/2022 | 70 | $54.60 |
| 02/10/2022 | 10 | $54.50 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 02/10/2022 | 4 | $54.40 |
| 02/10/2022 | 3 | $54.33 |
| 02/10/2022 | 100 | $54.45 |
| 02/10/2022 | 100 | $54.40 |
| 02/10/2022 | 4 | $54.32 |
| 02/10/2022 | 300 | $54.51 |
| 02/10/2022 | 200 | $54.40 |
| 02/10/2022 | 75 | $54.22 |
| 02/10/2022 | 250 | $54.45 |
| 02/10/2022 | 961 | $54.35 |
| 02/10/2022 | 1 | $54.30 |
| 02/10/2022 | 5 | $54.45 |
| 02/10/2022 | 74 | $54.33 |
| 02/10/2022 | 5 | $54.21 |
| 02/10/2022 | 10 | $54.45 |
| 02/10/2022 | 50 | $54.38 |
| 02/10/2022 | 20 | $54.25 |
| 02/10/2022 | 300 | $54.52 |
| 02/10/2022 | 86 | $54.40 |
| 02/10/2022 | 2 | $54.22 |
| 02/10/2022 | 100 | $54.45 |
| 02/10/2022 | 100 | $54.30 |
| 02/10/2022 | 274 | $54.21 |
| 02/10/2022 | 100 | $54.55 |
| 02/10/2022 | 5 | $54.43 |
| 02/10/2022 | 75 | $54.26 |
| 02/10/2022 | 4 | $54.51 |
| 02/10/2022 | 1 | $54.40 |
| 02/10/2022 | 1 | $54.33 |

Prices listed are rounded up to two decimal places.

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 5, 2022, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the email addresses on the attached Electronic Mail Notice List, and

I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ Jason C. Davis
JASON C. DAVIS

ROBBINS GELLER RUDMAN
      & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
Email:  jdavis@rgrdlaw.com

## Mailing Information for a Case 3:22-cv-01243-VC Toole v. Affirm Holdings, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Rachele R. Byrd**
  byrd@whafh.com,fileclerk@whafh.com

- **Jennifer N. Caringal**
  JCaringal@rgrdlaw.com

- **Michael D. Celio**
  MCelio@gibsondunn.com,cblock@gibsondunn.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Monica K. Loseman**
  mloseman@gibsondunn.com

- **Jayvan E. Mitchell**
  jmitchell@gibsondunn.com,rreboredo@gibsondunn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,abarbosa@pomlaw.com,fgravenson@poml

- **Sophia Marie Rios**
  srios@bm.net,jgionnette@bm.net

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Jacob Allen Walker**
  jake@blockleviton.com,jacob-walker-5598@ecf.pacerpro.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)